**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
                                        :
SKANGA ENERGY & MARINE LIMITED,         :
                                        :
                    Plaintiff,          :          Case 1:11-cv-04296-DLC
                                        :                ECF CASE
          v.                            :
                                        :
AREVENCA S.A., PETRÓLEOS DE             :
VENEZUELA S.A., and JAVIER GONZALEZ     :
ALVAREZ                                 :
                    Defendants.         :
_____:


**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

Ronald E.M. Goodman
Lawrence H. Martin
Vivek Krishnamurthy
FOLEY HOAG LLP
1875 K Street NW, Suite 800
Washington, DC 20006-1238
Telephone: 202-223-1200
Facsimile: 202-467-9672
Email: lhm@foleyhoag.com

Marjorie E. Berman
KRANTZ & BERMAN LLP
747 Third Avenue
32nd Floor
New York, New York 10017
Telephone: 212-661-0009
Facsimile: 212-355-5009
E-Mail: mberman@krantzberman.com

*Attorneys for Defendant Petróleos de Venezuela S.A*

**TABLE OF CONTENTS**

BACKGROUND ........................................................................................................... 1

ARGUMENT ............................................................................................................... 13

    I.     PDVSA IS PRESUMPTIVELY IMMUNE FROM SUIT UNDER THE FSIA ...................................................................................................... 13

    II.    THE COMMERCIAL ACTIVITIES EXCEPTION DOES NOT APPLY ....................................................................................................... 14

          A.     Venezuelan Law Applies to the Dispositive Agency Issue ............... 16

          B.     There Is No Serious Evidence that Arevenca Acted as PDVSA's Agent ................................................................................. 18

    III.   THE COURT ALSO LACKS PERSONAL JURISDICTION OVER PDVSA ...................................................................................... 23

CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose*, 235 Fed. App'x 776 (2d Cir. 2007) ....... 15

*Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428 (1989) .............................. 13

*Bank of N.Y. v. Yugoimport*, No. 11-1990-cv, 2014 U.S. App. LEXIS 2454 (2d Cir. Feb. 10,

    2014) ................................................................................................................................. 16, 17

*Brink's Ltd. v. South African Airways*, 93 F.3d 1022 (2d Cir. 1996) ........................................... 17

*Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985) ................................................................ 24

*Eli Lilly do Brasil, Ltda v. Fed. Express Corp.*, 502 F.3d 78 (2d Cir. 2007) ............................... 17

*Frontera Resources Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic,* 582 F.3d 393

    (2d Cir. 2009) .......................................................................................................................... 23

*Genger v. Sharon*, No 10 Civ. 4506 (SAS), 2012 U.S. Dist. LEXIS 126187 (S.D.N.Y. Sept. 5,

    2012) ....................................................................................................................................... 17

*Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408 (1984) ................................. 24

*Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 98 N.Y.2d 238 (N.Y. 2002) .............................. 16

*Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945) ..................................................................... 24

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70

    (2d Cir. 2002) .......................................................................................................................... 16

*Kensington Int'l, Ltd. v. Itoua,* 505 F.3d 147 (2d Cir 2007) ................................................. 14, 15

*Lehman Bros. Commer. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp.

    2d 118 (S.D.N.Y. 2000) .......................................................................................................... 17

*Lotes Co. v. Hon Hai Precision Indus. Co.*, No. 12 Civ. 7465 (SAS), 2013 U.S. Dist. LEXIS

    69407 (S.D.N.Y. May 14, 2013) .............................................................................................. 20

*Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204 (2d Cir. 2003) ........................................ 24

*Moscovits v. Magyar Cukor*, No. 00 Civ. 0031 (VM), 2001 U.S. Dist. LEXIS 9252 (S.D.N.Y. June 29, 2001) ............................................................................................................... 17

*Oster v. Republic of South Africa*, 530 F. Supp. 2d 92 (D.D.C. 2007), *aff'd* 298 Fed. App'x 6 (D.C. Cir. 2008) ........................................................................................................ 20, 23

*Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1 (2d Cir. 1996) ......................................... 16

*Saudi Arabia v. Nelson,* 507 U.S. 349 (1993) ........................................................................ 13, 14

*Sikhs for Justice v. Nath*, 850 F. Supp. 2d 435 (S.D.N.Y. 2012) ................................................. 20

*Storr v. National Defence Security Council of the Republic of Indonesia*, No. 95 Civ. 9663 (AGS), 1997 U.S. Dist. LEXIS 15890 (S.D.N.Y. Oct. 9, 1997) ............................................. 16

*Texas Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981) ......... 23

*Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.,* 204 F.3d 384 (2d Cir. 2000) ....................................................................................................................... 15

*Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos*, 756 F. Supp. 136 (S.D.N.Y. 1991) ................................................................................................................ 17

*World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980) .............................................. 24

**Statutes**

Foreign Sovereign Immunities Act, 28 U.S.C § 1602 et seq. ............................................ 1, 13, 14

**Other Authorities**

Restatement (Second) Conflict of Laws § 292 (1971) ............................................................ 16, 17

**Rules**

Fed. R. Ev. 801 ......................................................................................................................... 19, 22

Plaintiff Skanga Energy & Marine Ltd. ("Skanga") claims that this case involves "a nefarious fraudulent scheme of international proportions." (2d Am. Compl. ¶ 1.) Whether that is true or not is an issue this Court need not decide. For reasons that will be made plain below, there are very serious reasons to doubt every facet of Skanga's story. Whatever the case, however, one thing is clear: none of it has anything to do with Defendant Petróleos de Venezuela S.A. ("PDVSA").

The Court will recall that the critical issue in this case is whether or not Defendant Arevenca S.A. ("Arevenca") was genuinely acting as agent for PDVSA in the transaction about which Plaintiff complains. After nearly a year of discovery, including on the dispositive agency issue, Skanga has no serious evidence tying PDVSA either to Arevenca or to any of the alleged wrongs at issue. The only thing it has are the supposed oral statements of an unrelated third party asserting that Arevenca was acting as PDVSA's agent. Under undisputed principles of Venezuelan agency law, this is not even close to enough. The alleged third-party statements are also directly refuted by the declaration of PDVSA's witness, which makes clear that neither in 2006 or 2007, nor any time since, has PDVSA had a relationship of any kind with Arevenca.

There is no dispute that PDVSA is a "foreign state" presumptively entitled to immunity under the Foreign Sovereign Immunities Act, 28 U.S.C § 1602 et seq. ("FSIA"). In the absence of an agency relationship between PDVSA and Arevenca, there is no conduct "of the foreign state" sufficient to bring this case within the scope of the FSIA's commercial activities exception. 28 U.S.C § 1605(a)(2). This Court is therefore without jurisdiction and Skanga's case must be dismissed.

## Background

Skanga is a Nigerian company first incorporated in 1992. (Martin Aff., Ex. 1 (Skanga's Cert. of Incorporation).) Its principal shareholder is Chief Lucky N. Igbinedion (Martin Aff., Ex.

2, p. 4 (Skanga's shareholder filings)), who, at the time of the events at issue in this case (2006-07), was Governor of Nigeria's Edo State. (Martin Aff., Ex. 3, p. 6 (Igbinedion Dep. Tr.).) In 2008, after leaving office, ex-Governor Igbinedion was convicted of corruption by the Nigerian courts pursuant to a plea-bargain agreement. (Martin Aff., Ex. 4 (Nigerian Fed. High Ct. Order).[1]) In 2011, the Nigerian Economic and Financial Crimes Commission also seized a number of his properties in Nigeria and London. (Martin Aff., Ex. 5 (Nigerian Fed. High Ct. Order & *Ex Parte* Originating Summons).[2]) The properties seized included the location of Skanga's offices. (*Id.*, p. 6.) And on April 9, 2014, the Nigerian Court of Appeal reinstated an additional 66-count indictment against ex-Governor Igbinedion, including money laundering charges, for which he must now stand trial. (*See* Martin Aff., Ex. 6, pp. 49-50 (Nigerian Ct. of App. Judgment).)

According to Skanga's Rule 30(b)(6) designee, the company was, prior to 2006, dormant. (Martin Aff., Ex. 7, p. 50 (Rule 30(b)(6) Dep. Tr., Feb. 13, 2014).) It was not engaged in operations of any kind. (*Id.*) Archived snapshots of its website from the time indicate that Skanga was telling the world a different story, however. A snapshot from August 14, 2006 states that "S[kanga] E[nergy] A[nd] M[arine] has long-term relationships with many of the world's most respectable energy companies offering services in disciplines of upstream logistics, shorebase services, ocean towing, offshore construction support etc." (Martin Aff., Ex. 8 (Skanga.com website report).)

Sometime during 2006, Mr. Christian Imoukhuede, a schoolmate of Mr. Igbinedion, became the company's Managing Director and allegedly attempted to breathe life into Skanga,

---

[1] At deposition, ex-Governor Igbinedion denied that his conviction was pursuant to a plea bargain agreement. (Martin Aff., Ex. 3, p. 34.)

[2] At deposition, ex-Governor Igbinedion also denied that any of his properties had ever been seized. (Martin Aff., Ex. 3, pp. 9-10.)

including by engaging in the import of petroleum products. (Martin Aff., Ex. 7, pp. 47-48, 58-59.) In the middle of that year, Mr. Imoukhuede claims to have attended an event organized by then-Governor Igbinedion in Abuja, Nigeria, at which he met a Venezuelan diplomat, Mr. Enrique Arrundell James. (Martin Aff., Ex. 9, pp. 44-47 (Rule 30(b)(6) Dep. Tr., Feb. 12, 2014).) According to Mr. Imoukhuede, he and Mr. Arrundell discussed the possibility of Skanga doing business with Venezuelan companies, including PDVSA. (*Id.*, p. 48.) Mr. Arrundell never specifically said he was acting on behalf of PDVSA and never presented a power-of-attorney to do so. (Martin Aff., Ex. 7, p. 25.)

Subsequently, Mr. Arrundell allegedly traveled to Venezuela, where, he told Mr. Imoukhuede, he would "make contacts for [Skanga] to do business with PDVSA" (Martin Aff., Ex. 9, p. 49) and other companies. (Martin Aff., Ex. 7, pp. 108-09.) Mr. Arrundell invited Mr. Imoukhuede to travel to Caracas to explore business opportunities there. (Martin Aff., Ex. 9, pp. 48-49.)

In Venezuela, Mr. Arrundell allegedly set up a meeting at Mr. Imoukhuede's hotel on October 29, 2006. (Martin Aff., Ex. 10, p. 4 (Skanga's 1st Int. Ans.).) According to Mr. Imoukhuede, Mr. Arrundell told him that there was a "man … coming [to the meeting who] represents the corporate agent of PDVSA, and that [Imoukhuede] needed to do this transaction, [Skanga] had to do it with the man who represents the corporate entity Arevenca." (Martin Aff., Ex. 9, pp. 57-58.) When the man in question, Defendant Francisco Javier González Álvarez, showed up, he told Mr. Imoukhude that "he had several businesses that had depots, installations, and … [a] strong relationship with PDVSA." (*Id.,* p. 59.) Mr. Arrundell then allegedly told Mr. Imoukhuede that Skanga would have to work through Arevenca if it wanted to do business with PDVSA. (*Id.*, p. 59.) None of these communications are documented.

The next day, October 30, Mr. Imoukhuede visited Venezuela's Ministry of Energy and Mines with Mr. Arrundell. (*Id.*, pp. 61-63.) The meeting was attended by Ms. Virginia Montilla, an employee of the Ministry of Energy and Mines, and Ms. Beatriz Dam, a mid-level analyst working in PDVSA's planning department. (*Id.*, pp. 62-63. *See also* Martin Aff., Ex. 11, pp. 94-97 (Dam Dep. Tr.).) Defendant González did not attend. (Martin Aff., Ex. 9, p. 63.) The meeting lasted only 10 to 20 minutes. (*Id.*, p. 65.)

Ms. Dam's responsibilities at PDVSA did not have anything to do with the sale of oil or petroleum products. (Martin Aff., Ex. 11, pp. 50-52, 61.) She therefore informed Mr. Imoukhuede that if he "wanted product[s] from PDVSA … [he would] have to direct [Skanga's] application through the supply and commerce director." (*Id.*) Arevenca was not mentioned at this meeting. (*Id.*, p. 66.)

The meeting with Ms. Dam is the only time that anyone from Skanga ever met with anyone who actually worked for PDVSA. (*See* Martin Aff., Ex. 10, pp. 1-2; Martin Aff., Ex. 9, p. 66.)

Acting on Ms. Dam's instructions, Mr. Imoukhuede sent PDVSA a letter expressing Skanga's interest in purchasing petroleum products on October 31. (Martin Aff., Ex. 12 (Letter from Imoukhuede to PDVSA); Martin Aff., Ex. 7, p. 159; Martin Aff., Ex. 9, pp. 64-65.) The letter does not mention Arevenca. (*See* Martin Aff., Ex. 12.) PDVSA never responded.

After the meeting at the Ministry of Energy and Mines, Mr. Arrundell allegedly told Mr. Imoukhuede that "if [Skanga] needed to deal with PDVSA, [it] should deal with Arevenca." (Martin Aff., Ex. 9, p. 68.) Back at Mr. Imoukhuede's hotel, the two met again with Defendant González, where the details of the proposed transaction were discussed. (*Id.*, p. 69.) According to Skanga's interrogatory answers: "Corporate Defendants would sell petroleum products to Skanga on credit, in consideration of Skanga's agreement to prepay certain charges [the freight charges]

in advance of delivery and to pay in full for the product itself within three months of receipt of delivery, with all payments to be made … to the Corporate Defendants' U.S. bank accounts in New York." (Martin Aff., Ex. 10, p. 5. *See also id.*, p. 8.) None of these communications are documented either.

Mr. Imoukhuede testified that at some point during this period he accessed PDVSA's website to "see if [he] could see the list of the corporate agents" and to view the page stating how to do business with PDVSA. (Martin Aff., Ex. 9, pp. 36-37.) Archived pages of PDVSA's website from March 14, October 18, and December 9, 2006 contain the express statement that "Product sales take effect between the provider and the client directly, with no intermediaries (third parties, representatives, etc.)." (Martin Aff., Ex. 13, pp. 7, 9, 11 (archived print-outs of PDVSA's website).) This fact is further confirmed in the attached Declaration of Mr. Humberto Ferrín Cortés,[3] who served as PDVSA's Contract Administration Manager in 2006 and 2007, which states: PDVSA does not "market products through independent commercial agents." (Ferrín Decl., § 4.) Mr. Ferrín's declaration further states: "PDVSA neither had nor currently has any business relationship or relationship of any other kind with any legal entity called AREVENCA S.A., AREVENCA, or Arenera Venezolana C.A." (*Id.*, ¶ 5.5.) PDVSA's website at the time also set out (as it still does now[4]) the necessary steps a company seeking to do business with PDVSA had to follow, including registering with PDVSA as a potential client, and disclosing detailed information about the company's structure, shareholders, finances and past

---

[3] PDVSA identified Mr. Ferrín as someone on whom it might rely in its Amended Initial Disclosures dated September 16, 2013. Skanga first indicated a desire to depose him by email dated February 7, 2014. In its letter to the Court dated February 21, 2014 (Dkt No. 139), Skanga elected to go forward with its case without deposing him.

[4] *See* PDVSA, Requirements for updating as a client for hydrocarbon sales (Exports) (Apr. 17, 2014, 10:13 AM), http://www.pdvsa.com/index.php?tpl=interface.en/design/biblioteca/readdoc.tpl.html&newsid_obj_id=5999&newsid_temas=111.

transactions. (Martin Aff., Ex. 13, pp. 7-12.) There is no evidence Skanga ever took any of these steps.

Mr. Imoukhuede also testified that he accessed Arevenca's website wherein Arevenca specifically claimed to be an agent of PDVSA. (Martin Aff., Ex. 9, pp. 34-35.) According to Mr. Imoukhuede, Arevenca's website also claimed that the company had oil terminals in numerous locations around the world. (*Id.*, pp. 35-36.) Archived pages of Arevenca's website from throughout 2006 and 2007 tell a different story, however. They contain no mention of PDVSA, whether as Arevenca's principal or otherwise. (*See* Martin Aff., Ex. 14 (archived print-outs of Arevenca's website).) Indeed, at all relevant times, Arevenca was not even claiming to be an oil company but rather the developer of a deep-water port complex and an associated real estate development in northern Venezuela. (Martin Aff., Ex. 14, pp. 31, 48, 89-92 (capturing Arevenca's website as it was on August 5, 2006 and January 15, 2007, respectively).)

After Mr. Imoukhuede returned to Nigeria in or around early November 2006, Skanga allegedly received an initial offer from Arevenca for 35,000 metric tons of diesel fuel in the form of an invoice dated November 7, 2006. (Martin Aff., Ex. 15 (alleged invoice from Arevenca).) The invoice specified the cost of freight as $1.4 million and the cost of the product as $16.9 million. (*Id.*) It references a purchase order Skanga admits it never issued (Martin Aff., Ex. 9, p. 81) and contains no reference to PDVSA.

Mr. Imoukhuede testified that because Skanga did not have the money to make the required freight payment, it took out a loan from another Nigerian company known as Sasco Investment Ltd. ("Sasco"). (*Id.*, pp. 110-11.) Skanga's putative loan request to Sasco is dated November 23, 2006. (Martin Aff., Ex. 16 (letter to Sasco).) Mr. Imoukhuede testified that the loan was subsequently made and the money used to make the required $1.4 million freight payment. (Martin Aff., Ex. 9, pp. 90, 110-11.)

Mr. Imoukhuede's testimony is inconsistent with the bank transfer documents produced by Skanga and confirmed as authentic by Mr. Imoukhuede. Those documents show that Skanga actually made its initial transfers to Arevenca at a bank known as CorpBanca in New York on November 10, 2006, nearly two weeks *before* the alleged loan request to Sasco was even made. (Martin Aff., Ex. 17, pp. 1, 2 (collection of wire transfer receipts).[5]) In addition, the bank transfer documents reflect payments of $1.05 million, not $1.4 million. (*Id.*) There is no evidence any of this money was transferred to PDVSA.

In its interrogatory answers, Skanga stated that it made these initial payments in reliance on certain "inducement documents," including an alleged PDVSA bill of lading (Martin Aff., Ex. 19) and certificate of quality (Martin Aff., Ex. 20) that had been confirmed as authentic by Venezuelan diplomats in Nigeria. (Martin Aff., Ex. 10, p. 7.) At deposition, however, Mr. Imoukhuede acknowledged that the initial payments were made *before* Skanga received the alleged PDVSA documents, both of which are dated November 24, 2006 (*i.e.*, two weeks after the initial transfers) and were only received by Skanga sometime in December. (Martin Aff., Ex. 9, p. 94.)

Mr. Imoukhuede further testified that, in retrospect, he no longer considers the bill of lading and certificate of quality to be authentic PDVSA documents. (*See* Martin Aff., Ex. 21, pp. 17-18 (Rule 30(b)(6) Dep. Tr., April 3, 2014).) The fact that the documents are inauthentic is confirmed by the declarations of Mr. Ferrín and Elisaúl Miquilena,[6] who identify multiple

---

[5] Because the current CorpBanca entity in New York is a different CorpBanca than in 2006, PDVSA was unable to confirm these transfers with the third-party subpoena it served on CorpBanca in New York on June 26, 2013. (*See* Martin Aff., Ex. 18 (letter from CorpBanca).)

[6] PDVSA identified Mr. Miquilena as someone on whom it might rely in its Amended Initial Disclosures dated September 16, 2013. Skanga first indicated a desire to depose him by email dated February 7, 2014. In its letter to the Court dated February 21, 2014 (Dkt No. 139), Skanga elected to go forward with its case without deposing him.

discrepancies between the documents produced by Skanga and authentic PDVSA documents. (Ferrín Decl. ¶ 8.2; Miquilena Decl. ¶ 3.1.)

In early January 2007, Mr. Imoukhuede claims to have returned to Venezuela as part of a trade delegation headed by then-Governor Igbinedion. (Martin Aff., Ex. 9, pp. 50-52.) Skanga did not meet with anyone from PDVSA during this second visit but instead only officials of the Venezuelan government. (*Id.*, pp. 129-30.) Mr. Imoukhuede repeatedly testified that it was during this second visit to Venezuela that Arevenca made an additional offer to Skanga, this time for 70,000 MT of premium motor spirits. (*Id.*, pp. 120-21. *See also* Martin Aff., P6, p. 66.)

The offer was communicated by means of an invoice that was actually dated a month earlier, December 3, 2006 (or December 13, depending on which of the two versions of the invoice produced by Skanga one prefers). (*Compare* Martin Aff., Ex. 22 (alleged invoice from Arevenca) *with* Martin Aff., Ex. 23 (alleged invoice from Arevenca).) This second invoice specified that freight would cost $2.8 million and the product itself $32.9 million. Like the previous invoice, it references a purchase order that Skanga admits it never made. (Martin Aff., Ex. 9, p. 124.)

The invoice came with two additional documents dated December 8, 2006 upon which Skanga claims to have relied in making further payments to Arevenca: a bill of "*loading*" dated December 8, 2006 bearing the logo of "Korean Tankers Maru,"[7] and a quality certificate bearing Arevenca's logo. (Martin Aff., Exs. 24 (alleged bill of loading) & 25 (alleged quality certificate).) Neither document makes any reference to PDVSA. Both also have compelling

---

[7] A Google search for "Korean Tankers Maru" returns no results.

indicia of being fakes. The "bill of loading," for example, is a rank cut-and-paste job that shows the multiple scars of various signatures and other elements being copied into it.[8] (*See id.*)

Upon receipt of these documents in early January 2007, Skanga claims to have transferred $9.8 million to Arevenca, "representing freight charges and a partial payment" for the premium motor spirits. (Martin Aff., Ex. 10, p. 8.) Because it did not have the funds to pay the $2.8 million in freight charges, Skanga allegedly obtained a "soft loan" from another Nigerian company, M.R.S. Oil & Gas Ltd. ("M.R.S."), with which Mr. Imoukhuede claimed to have done business in the past. (Martin Aff., Ex. 9, p. 161.) The loan was in the amount of $2.4 million and used to make the freight payment. (Martin Aff., Ex. 27, p. 2 (Skanga's 2d Int. Ans.).) The loan was not documented in any way. (Martin Aff., Ex. 9, p. 164.)

The bank transfer documents produced by Skanga and confirmed as authentic by Mr. Imoukhuede contradict this portrayal of the facts. In fact, they show two separate transfers nominally from M.R.S. to Arevenca, both in the amount of $2.8 million. (Martin Aff., Ex. 17, pp. 3, 6.) In other words, the record reflects a total transfer from "M.R.S." to Arevenca of $5.6 million, not the $2.4 million Skanga claims.[9] Moreover, the first transfer is dated December 19, 2006, more than two weeks *before* Mr. Imoukhuede's trip to Venezuela in early January 2007 at which the second transaction was supposedly agreed. (*Id.*, p. 3.) The second is dated December 28, 2006, approximately a week before his trip. (*Id.*, p. 6.) There is no evidence any of this money was transferred to PDVSA.

_____

[8] The bill of "loading" states that the vessel onto which the alleged cargo had been loaded was a Philippine-flag vessel named the "Digniti", whereas the quality certificate refers to the "Dignity." According to Lloyd's Register Group Services Ltd., there was no ship under either name in December 2006. (Martin Aff., Ex. 26.).

[9] These two separate transfers are confirmed by bank records produced to PDVSA by Citibank in response to third-party subpoenas served on it. (*See* Martin Aff., Ex. 28 (excerpt of Citibank subpoena responses).)

Additionally, M.R.S.'s annual filings with the Nigerian Corporate Affairs Commission ("CAC") for the years 2006 and 2007 – duly authenticated by the CAC, the Nigerian Foreign Ministry and the Embassy of Nigeria in Washington – state that, for both years, "the company has not commenced business."[10] (Martin Aff., Ex. 29, pp. 7, 21.) M.R.S.'s balance sheet for both years reflect "current assets" of the Nigerian equivalent of only some $11,500 (1,466,000 Naira). (*Id.*, pp. 11, 23.)

Mr. Imoukhuede testified that during his January 2007 trip to Caracas he also got assurances from Defendant González that the November shipment of diesel would be arriving to Nigeria shortly. (Martin Aff., Ex. 9, p. 158.) Those assurances allegedly took place in the presence of Venezuelan government officials but again, no one from PDVSA was present. (*Id.*, pp. 153-59.) Mr. Imoukhuede also testified that he expected the second shipment of premium motors spirits to arrive in Nigeria in or around March 2007. (*Id.*, p. 176.)

According to Mr. Imoukhuede, after his return to Nigeria, Skanga secured bank financing (*Id.*, p. 159) and, on February 6, 2007, transferred $7 million to Arevenca (Martin Aff., Ex. 17, p. 4), even though the first shipment had still not arrived. (Martin Aff., Ex. 9, pp. 176-78.) Mr. Imoukhuede testified that on or around February 2, 2007 Arevenca instructed Skanga to change the bank into which it made payments. (*Id.*, p. 143.) Although Skanga claims that Arevenca requested payment to Citibank in New York (*See, e.g.*, 2d Am. Compl. ¶ 37; Martin Aff., Ex. 10, p. 8; Martin Aff., Ex. 9, p. 143), the new account into which Arevenca demanded payment was

---

[10] According to PDVSA's Nigerian law expert, Uzoma Henry Azikiwe, Esq., Nigerian corporations are required, "once at least in every year, [to] make and deliver to the CAC an annual return in the form, and containing the matters specified" in several sections of the Nigerian Companies and Allied Matters Act ("CAMA"), No. 32 of 1990. Any person who "willfully makes a statement which is false in any material particular knowing it to be false" in preparing such annual returns is liable to be imprisoned for a term of up to two years. (Azikiwe Decl., pp. 2, 4.)

actually Arevenca's *Swiss* bank account at BSI SA in Lugano, Switzerland. (Martin Aff., Ex. 30 (letter from Arevenca).)[11]

As stated, Mr. Imoukhuede testified that Skanga received the instruction to pay into Arevenca's Swiss bank account in early February 2007. Skanga's bank transfer documents show, however, that the first payment to BSI Lugano was actually the December 28, 2006 transfer from "M.R.S." to Arevenca in the amount of $2.8 million, more than month before the instruction was received. (*See* Martin Aff., Ex. 17, p. 6.)

On February 6, 2007, Skanga transferred the final $7 million to Arevenca's Swiss bank account. (*Id.*, p. 4.) There is no evidence that any of this money was transferred to PDVSA either.

By around April 2007, when neither vessel had arrived in Nigeria, Skanga finally concluded that they would never come. (Martin Aff., Ex. 9, pp. 177-80.) It therefore allegedly sought the help of Nigeria's Ambassador to Venezuela, who, at Skanga's behest, supposedly spoke with PDVSA for purposes of facilitating a new transaction that would allow Skanga to "recoup" its losses. (*Id.*, p. 200.) This is nominally evidenced by a May 15, 2007 letter from the Nigerian Ambassador to PDVSA purporting to introduce Skanga (Martin Aff., Ex. 31) and a May 23, 2007 letter of intention from Skanga seeking to purchase diesel from PDVSA (Martin Aff., Ex. 32). Neither document makes reference to the failed transactions with Arevenca or suggests any prior dealings with PDVSA. (*See Id.*) Mr. Imoukhuede admitted that he himself did not speak with anyone from PDVSA. (Martin Aff., Ex. 9, pp. 190-93.) The contemplated transaction never materialized. (*See id.*, pp. 194-200.)

---

[11] The account name of Arevenca's Swiss bank account is "91329 ELEGUA 3377." (Martin Aff., Ex. 30.) Tellingly, "Elegua" is an Orisha (i.e., spirit or divinity) in Santería (a New World belief system that merges West African religious traditions with Roman Catholicism) that is known as the "trickster." (See Martin Aff., Exs. 44 & 45 (excerpts from learned treatises).)

Thereafter, on May 28, 2007, Skanga sent a letter to the Ambassador of Venezuela in Nigeria with a "re" line that reads: "LETTER OF PROTEST OF FRAUDULENT EXTORTION OF MONEY BY A VENEZUELAN COMPANY BY NAME AREVENCA REPRESENTED BY ITS PRESIDENT, FRANCISCO JAVIER GONZALEZ ALVAREZ." (Martin Aff., Ex. 33.) The letter protests "the fraudulent nature with which a Venezuela by name FRANCISCO JAVIER GONZALEZ ALVAREZ using his company Arevenca Complex to extort money from our company." (*Id.*) The letter further complains that González gave Skanga a "[f]ake PDVSA bill of lading" and a "[f]ake PDVSA certificate of quality", and that González was introduced to Skanga by Arrundell. (*Id.*) The letter makes no mention of PDVSA, whether as principal to Arevenca's agent or otherwise. (*Id.*) Skanga sent virtually identical letters to the Venezuelan Vice Minister of Foreign Affairs for Africa and the Nigerian Ambassador in Venezuela on June 7. (Martin Aff., Exs. 34 & 35.) Again, neither letter mentions PDVSA. (*Id.*)

A week later, on June 14, 2007, the Nigerian Ambassador in Venezuela sent letters to four Venezuelan officials, including the Minister of Energy and Mines, in which he accused Defendant González "of criminally defrauding" Skanga by "fail[ing] to delivery any petroleum products as agreed" and presenting "fake" documents to Skanga. (Martin Aff., Exs. 36, 37, 38 & 39.) These letters too make no mention of PDVSA. (*Id.*)

According to Mr. Imoukhuede, following what he called the "botched" transactions with Arevenca, Skanga was forced to close shop and lay off all its employees in or around October 2007. (Martin Aff., Ex. 7, pp. 40, 167-168.) Mr. Imoukhuede had considerable difficulty recalling the last names of any of his former employees. (*Id.*, pp. 41-44) This lawsuit followed on July 22, 2008 (although PDVSA was not served until May 27, 2011). Defendants Arevenca and González have never been served. In fact, to PDVSA's knowledge, Skanga has made no effort to do so following removal to this Court on June 24, 2011.

Skanga's annual filings with the Nigerian CAC for the years 2006-08 (that is, the years during which the alleged transactions took place and it brought suit) all contain precisely the same statement: "[T]he company has not done any business, and as a result no profit or loss account has been annexed thereto" (Martin Aff., Ex. 40, pp. 7, 17, 27.) The same filings – all of which are authenticated by the CAC, the Nigerian Foreign Ministry and the Nigerian Embassy in Washington – also contain a "Statement of Affairs" listing the company's assets and liabilities, and showing net assets totaling the Nigerian equivalent of approximately $300,000 at then-prevailing exchange rates (38,000,000 Naira). (Martin Aff., Ex. 40, pp. 9, 19, 29.) The stamps on Skanga's CAC filings for the years in question indicate that they were filed on May 5, 2009; that is, nine months *after* this case was filed. (*See id.*)

**Argument**

## I. PDVSA IS PRESUMPTIVELY IMMUNE FROM SUIT UNDER THE FSIA

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Saudi Arabia v. Nelson,* 507 U.S. 349, 355 (1993) (citing *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 443 (1989)). Under Section 1604 of the Act, "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" unless one of the limited exceptions enumerated in Sections 1605 and 1605A applies. If none does, American courts cannot hear the case. *Amerada Hess,* 488 U.S. at 434-39; *Nelson,* 507 U.S. at 355.

As used in Section 1604, the term "foreign state" includes both the foreign state itself and any "agency and instrumentality" thereof. 28 U.S.C. § 1603(a). An agency or instrumentality means any entity –

> (1) which is a separate legal person, corporate or otherwise, and

> (2) … a majority of whose shares or other ownership interest is owned by a
> foreign state or a political subdivision thereof, and

> (3) which is neither a citizen of a State of the United States … nor created
> under the laws of any third country."

28 U.S.C. § 1603(b).

Once a defendant demonstrates that it is a "foreign state" within the meaning of the Act, a presumption of immunity attaches. It is then up to plaintiff to demonstrate that one or more of the FSIA's narrow exceptions apply. *See Nelson*, 507 U.S. at 355 ("Under the [FSIA], a foreign state is presumptively immune from the jurisdiction of United States courts…"); *Kensington Int'l, Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007) ("Once the defendant presents a prima facie case that it is a foreign state, the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted…") (quotation omitted).

There is no dispute that PDVSA is an agency or instrumentality of Venezuela. Plaintiff's Complaint admits the point when it correctly acknowledges that PDVSA is "owned by the Venezuelan government." (2d Am. Compl. ¶ 13; *see also* Ferrín Decl. ¶ 2.1 (stating that "PDVSA is a … corporation whose sole shareholder is the Bolivarian Republic of Venezuela").) PDVSA is therefore presumptively entitled to sovereign immunity and the onus is on Skanga to show that an exception to its immunity applies. Even with the benefit of nearly a year's worth of discovery, Skanga is unable to do so.

## II.    THE COMMERCIAL ACTIVITIES EXCEPTION DOES NOT APPLY

The only exception to PDVSA's sovereign immunity implicated in this case is the "commercial activities" exception. Section 1605(a)(2) of the Act provides an exception to sovereign immunity in cases:

> in which the action is based upon [(1)] a commercial activity carried on in the
> United States by the foreign state; or [(2)] upon an act performed in the United
> States in connection with a commercial activity of the foreign state elsewhere;
> or [(3)] upon an act outside the territory of the United States in connection
> with a commercial activity of the foreign state elsewhere and that act causes a
> direct effect in the United States.

The first two clauses of the commercial activities exception plainly do not apply. The only connection between Skanga's case and the United States is the claimed payment of funds into Arevenca's account at CorpBanca in New York.[12] It is therefore not "based upon"[13] either a commercial activity carried on in the U.S. or an act performed in the U.S. in connection with a commercial activity elsewhere. Only the exception's third clause even arguably applies.

In order to establish jurisdiction over PDVSA, Skanga must therefore come forward with facts sufficient to establish that its case is based upon (1) a commercial activity; (2) of the foreign state; (3) outside the U.S.; that (4) causes a direct effect in this country. Skanga does not and cannot satisfy element (2). It does not have the facts to establish that the commercial activities about which it complains were "of the foreign state"; *i.e.*, that they were undertaken by PDVSA. Its case must therefore be dismissed with prejudice.

Because there is absolutely no evidence of PDVSA being directly involved in the transactions at issue in this case, Skanga's attempt to pin liability on PDVSA depends entirely on the assertion that Arevenca was at all material times acting as agent for PDVSA. The trouble for Skanga is, however, that there is no serious or relevant evidence to support this assertion. Indeed, it is directly refuted by substantial record evidence to the contrary. *See Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose*, 235 Fed. App'x 776, 780 (2d Cir. 2007) (affirming in

---

[12] As stated above, Skanga initially claimed that payments had also been made into an Arevenca account at Citibank in New York. That claim is, however, belied by the record, which shows that the additional payments went to Switzerland, not New York. (*See* Martin Aff., Ex. 17, p. 4.)

[13] The Second Circuit has explained that the "based upon" language in the commercial activities exception:

> [a]t a minimum… implies a causal relationship. Thus, at the least, the 'act that caused a direct effect in the United States' ('the Act') must be a 'but for' cause of the judgments that are the ground of this suit. That is, it must be true that without the Act, there would be no judgments on which to sue. But this is not enough. … '[B]ased upon' requires a degree of closeness between the acts giving rise to the cause of action and those needed to establish jurisdiction that is considerably greater than common law causation requirements.

*Kensington Int'l, Ltd. v. Itoua,* 505 F.3d 147, 155 (2d Cir. 2007) (*citing Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.,* 204 F.3d 384, 390 (2d Cir. 2000)) (last alteration in original).

relevant part the District Court's refusal to apply the commercial activities exception to a foreign state and state-owned corporation where an individual did not have authority to bind the state and state enterprise); *Storr v. National Defence Security Council of the Republic of Indonesia*, No. 95 Civ. 9663 (AGS), 1997 U.S. Dist. LEXIS 15890, at *11-12 (S.D.N.Y. Oct. 9, 1997) (commercial activities exception did not apply where signers of certain promissory notes did not have authority to act on behalf of foreign state). Accordingly, PDVSA's sovereign immunity remains intact and this case must be dismissed for lack of jurisdiction.

### A. Venezuelan Law Applies to the Dispositive Agency Issue

Whether an agency relationship existed between PDVSA and Arevenca is a question governed by Venezuelan law.[14] The FSIA is a jurisdictional statute. It does not affect the applicable substantive law but instead "operates as a pass-through to state law principles." *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 12 (2d Cir. 1996) (quotation omitted). The applicable law is determined by the same choice of law rules applicable to any other party; namely, those of the forum state. *See Bank of N.Y. v. Yugoimport*, No. 11-1990-cv, 2014 U.S. App. LEXIS 2454, at *21 (2d Cir. Feb. 10, 2014) ("When subject matter jurisdiction is based on the [FSIA], we apply the choice-of-law rules of the forum state, here New York, with respect to all issues governed by state substantive law.") (citation omitted); *see also Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 84 (2d Cir. 2002).

Under New York choice of law rules, questions of agency are governed by the law of the forum with "the most significant relationship with the particular issue in conflict." *Indosuez Int'l*

---

[14] This Court anticipated just this conclusion in its June 20, 2012 Opinion and Order denying PDVSA's prior motion to dismiss. *See Skanga Energy & Marine, Ltd. v. Arevenca S.A.*, 875 F. Supp. 2d 264, 269 n.3 (S.D.N.Y. 2012) ("Because the FSIA 'does not affect the substantive law determining the liability of a foreign state,' *First Fidelity Bank, N.A. v. Gov't of Antigua & Barbuda-Permanent Mission*, 877 F.2d 189, 194 n.3 (2d Cir. 1989), the question of whether PDVSA may be held liable for the acts of Arevenca and Alvarez on an agency theory may ultimately be determined with reference to the Venezuelan law of agency." *See* Restatement (Second) Conflict of Laws § 292 (1971) (choice of law questions of actual and apparent authority subject to 'most significant relationship' test.)).

*Fin. B.V. v. Nat'l Reserve Bank*, 98 N.Y.2d 238, 244-45 (N.Y. 2002) (citing RESTATEMENT (SECOND) CONFLICT OF LAWS § 292(1) ); *see also Genger v. Sharon*, No 10 Civ. 4506 (SAS), 2012 U.S. Dist. LEXIS 126187, at *13 (S.D.N.Y. Sept. 5, 2012).[15] In determining which jurisdiction has that relationship, "New York courts consider 'a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile … of the contracting parties.'" *Bank of N.Y.*, 2014 U.S. App. LEXIS 2454, at *21-22 (quoting *Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1030-31 (2d Cir. 1996)) (alteration in original).

Venezuela plainly has "the most significant relationship with the particular issue in conflict" here. *Indosuez Int'l Fin. B.V.*, 98 N.Y.2d at 244. All of the Defendants are Venezuelan, the ostensible transaction was for Venezuelan petroleum products, negotiations took place in Venezuela and the purported contract was concluded there. Indeed, Skanga specifically traveled to Venezuela in order to initiate the transaction. "This solicitation is an important factor in deciding the forum with the most significant interest." *Lehman Bros. Commer. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 118, 145 & n.17 (S.D.N.Y. 2000). More fundamentally still, the core inquiry in this case is whether an instrumentality of the Venezuelan state is bound by the acts of a third party. The significance of that question to Venezuela is evident. *See Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos*, 756 F. Supp. 136, 141 (S.D.N.Y. 1991) (holding that the interest of a state in regulating its

---

[15] Because New York follows the RESTATEMENT standard of applying the law of the forum with the most significant relationship to the issues in question, the analysis would be substantially the same under the federal common law choice of law rules, which also follow the RESTATEMENT. *See Eli Lilly do Brasil, Ltda v. Fed. Express Corp.*, 502 F.3d 78, 81 (2d Cir. 2007) ("As our prior cases indicate, when conducting a federal common law choice-of-law analysis, absent guidance from Congress, we may consult the RESTATEMENT (SECOND) OF CONFLICT OF LAWS.") (citations omitted); *Moscovits v. Magyar Cukor*, No. 00 Civ. 0031 (VM), 2001 U.S. Dist. LEXIS 9252, at *22 (S.D.N.Y. June 29, 2001) ("It is highly likely that Hungarian law would apply here, regardless of whether federal or New York State choice of law rules apply. Both doctrines usually apply the law of the jurisdiction with the most significant interest in or relation to the action being adjudicated.") (citations omitted).

instrumentalities supports the application of that state's law). Accordingly, whether Arevenca had authority to act on behalf of PDVSA must be determined under Venezuelan law.

### B. There Is No Serious Evidence that Arevenca Acted as PDVSA's Agent

The accompanying Expert Declaration on Venezuelan Law of Luis Alberto García Montoya sets forth the rules applicable to the establishment of a principal-agent relationship in Venezuela. As Dr. García explains, under Venezuelan law, an agency-type relationship can be created in several ways. These include through an agency agreement, as well as by entering into agreements (express or implied) for one party to act on behalf on another for limited purposes. (García Decl. ¶¶ 35-40, 45, 74-78, 80-83.) The essential points are simple: (1) the principal-agent relationship must be established through an actual agency agreement; and (2) Venezuela has no analogue to the common law concept of apparent authority. (*See id.*, ¶¶ 38-40, 43-45.) Notably, none of these points are disputed by Skanga's Venezuelan law expert, Manuel A. Gómez.[16] (*See* Martin Aff., Ex. 41 (Skanga's Venezuelan Law Report).)

There is no evidence of any such agency agreement – or indeed any relationship whatsoever – between PDVSA and Arevenca. In point of fact, the evidence is very much to the contrary. According to the accompanying Declaration of Humberto Ferrín, PDVSA does not "market[] products through independent commercial agents" and has "no agency, delegation or proxy relationship with" Arevenca. (Ferrín Decl. § 4, ¶ 5.1. *See also id.* ¶¶ 5.2-5.5.) Indeed, at the end of discovery during his reopened deposition on April 3, 2014, Mr. Imoukhuede, speaking

---

[16] Rather than contest Mr. García's detailed examination of Venezuelan agency law, Mr. Gómez largely confines himself to arguing instead that the existence of the alleged PDVSA bill of lading was by itself suggestive of a contractual relationship between Skanga and PDVSA, and that Skanga reasonably relied on the bill of lading in making payments to Arevenca. These arguments are defeated on their face by just two facts: (1) the "PDVSA" bill of lading is an admitted fake (*see* Martin Aff., Ex. 21, pp. 17-18; Exs. 36, 37, 38 & 39); and (2) Skanga made payment to Arevenca *before* it ever received the bill of lading (Martin Aff., Ex. 17, pp. 1, 2; Ex. 9, p. 94).

as Skanga's Rule 30(b)(6) designee, expressed serious doubts about whether he now thinks that Arevenca was genuinely PDVSA's agent. (Martin Aff., Ex. 21, pp. 94-95.)

The Ferrín Declaration also makes clear that PDVSA could not possibly have been involved in the acts and omissions giving rise to this case, even indirectly through Arevenca acting as "agent." PDVSA is a holding company the purpose of which is the "planning, coordination and supervision of its subsidiaries." (Ferrín Decl. ¶ 3.1.) It does not itself participate in commercial transactions involving the purchase and sale of oil or petroleum products. (*Id.*) Its subsidiaries are the entities that do so. (*Id.*, ¶ 3.1, § IV.) PDVSA therefore could not have taken part in the transactions about which Skanga complains.

In the face of all this evidence, the only thing that Skanga has is Mr. Imoukhuede's testimony concerning the alleged oral statements of Mr. Arrundell to the effect that Arevenca was PDVSA's agent. This is not nearly enough. *First*, the mere fact that a person asserts the existence of an agency relationship is insufficient to make it so, all the more when the speaker is an unrelated third party. The accompanying declaration of Dr. García makes clear how an agency relationship is formed under Venezuelan law, and there is no evidence whatsoever that any of these requirements were satisfied.

*Second*, there is also no indication that Mr. Arrundell was empowered to speak for PDVSA – not that that would be enough even if it were true (which it is not). Mr. Imoukhuede himself testified that Mr. Arrundell never produced any evidence to indicate that he was so empowered. (Martin Aff., Ex. 7, p. 25.) Moreover, according to the Ferrín Declaration, "Venezuelan diplomats [are not] empowered in any way to speak on behalf of PDVSA or its affiliates." (Ferrín Decl. § 4.) This is still further confirmed by the declaration of Dr. García which makes clear that under Venezuelan law Venezuelan diplomats have no power to "enter

into any contract binding on the … companies in which [Venezuela] has a majority equity interest, including PDVSA." (García Decl. ¶ 51.)

*Third*, to the extent they may be offered to establish the truth of the matter asserted – *i.e.*, that Arevenca was PDVSA's agent – Mr. Arrundell's statements are plainly hearsay. *See* FED. R. EV. 801. They are therefore insufficient at this stage to establish an exception to immunity, especially given that PDVSA has offered evidence refuting them. *See Lotes Co. v. Hon Hai Precision Indus. Co.*, No. 12 Civ. 7465 (SAS), 2013 U.S. Dist. LEXIS 69407, at *14 (S.D.N.Y. May 14, 2013) (stating that in deciding a Rule 12(b)(1) motion, the court may not consider hearsay statements); *Oster v. Republic of South Africa*, 530 F. Supp. 2d 92, 98 (D.D.C. 2007), *aff'd* 298 Fed. App'x 6 (D.C. Cir. 2008) (refusing to give weight to an unsubstantiated hearsay assertion in a motion to dismiss for lack of subject matter jurisdiction under the FSIA); *see also Sikhs for Justice v. Nath*, 850 F. Supp. 2d 435, 441 (S.D.N.Y. 2012) (holding that the unsubstantiated out of court statement of a third party had no weight in overcoming a sworn statement in order to show agency in a similar fact-based motion to dismiss analysis).

*Fourth*, had Skanga genuinely made even the most cursory inquiry into the issue, it would have readily discovered that PDVSA at all times made it clear to the world that it did not work through agents. Its website at the time made that fact explicit. Notably, the only time Skanga met with anyone who actually worked for PDVSA (Ms. Dam), she specifically directed it to submit its application to do business through the right channels; namely, the commerce and supply department. (Martin Aff., Ex. 11, p. 66.)

The only other scraps of would-be evidence Skanga might point to – the alleged PDVSA bill of lading and certificate of quality – are even more worthless. Indeed, Skanga itself has already admitted that it does not consider either to be an authentic PDVSA document (*see* Martin Aff., Ex. 21, pp. 17-18) and has referred to them variously as "fake" and "forged." (Martin Aff.,

Exs. 36, 37, 38 & 39.) Indeed, the fraudulent nature of both documents is so obvious as to be almost painful. They can therefore do nothing to even suggest the existence of an agency agreement between Arevenca and PDVSA, much less prove it.

As stated already above, neither the bill of lading nor the certificate of quality bear any resemblance to the documents used by PDVSA affiliates in the ordinary course of business. (Ferrín Decl. ¶ 8.2; Miquilena Decl. ¶ 3.1.) But that statement does not even begin to capture just how plainly false the documents really are. The bill of lading, for instance, contains the following language: "NOTE Liability Limitation for loss or damage in this shipment may be applicable. See 49 U.S.C. - 14706(c)(1)(A) and (B)." (Martin Aff., Ex. 19.) The reference to the United States Code by itself is more than a little remarkable considering the nominal shipment was being made from Venezuela to Nigeria. What tips the scales from remarkable to absurd, however, is the fact that the referenced code section deals exclusively with shipments by "motor carriers" (*i.e.*, trucks)! The language below that also refers to "the applicable regulations of the Department of Transportation." (*Id.*) Not coincidentally, virtually identical copies of the same form bill of lading are readily available at multiple internet sites.[17]

The bill of lading also identifies the vessel onto which the alleged cargo had been loaded as the "P. Ventur." Yet, according to Lloyd's Register Group Services Ltd. in London, no such ship ever existed.[18] (Martin Aff., Ex. 26.).

---

[17] *See, e.g.*, Association Freight Services, Straight Bill of Lading (Apr. 1, 2014), http://www.associationfreight.com/documents/AFSBlankBOL.pdf; B&E Storage and Transfer, Straight Bill of Lading (Apr. 1, 2014), http://www.bnestorage.com/pdf_forms/bill_of_lading.pdf.

[18] PDVSA requested the original of the bill of lading in discovery. Mr. Imoukhuede testified that it had been left behind in a safe in Skanga's former offices at 55-C Adebisi Omotola Street in Lagos when the company ceased business. He further testified that he asked ex-Governor Igbinedion's daughter who, he said, now manages the property, to try to locate it in response to PDVSA's July 2013 request. He reported that she was unable to do so. (Martin Aff., Ex. 7, pp. 54-55, 90-93). This is remarkable because the building in which Skanga's offices were formerly located were seized by the Nigerian government in 2011 (Martin Aff., Ex. 5, p. 6), and a hotel currently occupies that address (Martin Aff., Ex. 42 (Majisola Jawando Aff.)).

The alleged certificate of quality (Martin Aff., Ex. 20) is an equally transparent fake. Although allegedly attesting to quality testing done at facilities in Amuay, Venezuela, the telephone area code appearing on the document is for an entirely different area of Venezuela. (Miquilena Decl. ¶ 3.1.) Moreover, much like the bill of lading, a substantively identical copy of the same document – down to the signature, "PDVSA" stamp, measurement values and shore tank number ("AM1628") – is available for download on the internet (albeit in a slightly modified format).[19]

Nor is Skanga's case salvaged by its contention that the documents' authenticity was confirmed by one or more Venezuelan diplomats. According to Mr. Imoukhuede, he sent Skanga's then-operations manager, Mr. Clement Ofili (who has since passed away), to the Venezuelan consulate in Abuja where, he later reported to Mr. Imoukhuede, unspecified consulate employees confirmed the authenticity of the documents. (*See* Martin Aff., Ex. 9, p. 48.) Mr. Imoukhuede testified also that Mr. Arrundell confirmed the authenticity of the documents to him over the telephone. (Martin Aff., Ex. 21, p. 36; Ex. 10, p. 7.)

This "evidence" does nothing for Skanga for several reasons. *First*, even accepting that these confirmations actually took place, they cannot convert obviously fraudulent documents into authentic ones. The fact remains that, as fakes (a fact Skanga admits), they can do nothing to even suggest the existence of an agency agreement between PDVSA and Arevenca.

*Second*, the alleged confirmations are also legally irrelevant. As noted already above, Venezuelan law requires an actual agency agreement to establish a principal-agent relationship. The confirmations Skanga points to are therefore only relevant to the extent they might be offered to prove the truth of the matter asserted; namely, that the documents were genuinely

---

[19] *See* <u>Diesel 2 Soft Offer</u> (Apr. 10, 2014), http://www.docstoc.com/docs/47758382/DIESEL-D2-SOFT-OFFER.

issued by PDVSA. Yet, precisely to that extent, they are hearsay (or hearsay within hearsay) which, at this stage, are plainly insufficient to overcome the substantial evidence to the contrary. FED. R. EV. 801; *see also Lotes Co.*, 2013 U.S. Dist. LEXIS 69407, at *14; *Oster*, 530 F. Supp. 2d at 98.

*Third*, there has been no showing that any Venezuelan diplomat, including Mr. Arrundell, is competent to speak to the authenticity *vel non* of PDVSA documents. Indeed, the undisputed evidence is very much to the contrary. (*See* Ferrín Decl. § 4 & García Decl. ¶¶ 46-54, 63-67.)

\*

For all these reasons, the undisputed evidence disproves the existence of an agency relationship, or indeed any relationship, between PDVSA and Arevenca. There is therefore no conduct "of the foreign state" in this case sufficient to satisfy the commercial activities exception to the FSIA. Accordingly, Skanga's case against PDVSA must be dismissed for lack of subject matter jurisdiction.

## III.    THE COURT ALSO LACKS PERSONAL JURISDICTION OVER PDVSA

Plaintiff's Second Amended Complaint must also be dismissed for want of personal jurisdiction. Skanga has not shown that PDVSA has sufficient contacts with New York to render the exercise of personal jurisdiction consistent with due process.

It was previously the rule in this Circuit that the FSIA "cannot create personal jurisdiction where the Constitution forbids it. Accordingly, each finding of personal jurisdiction under the FSIA requires, in addition, a due process scrutiny of the court's power to exercise its authority over a particular defendant." *Texas Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 308 (2d Cir. 1981). In 2009, however, the Second Circuit overruled *Texas Trading* but only in part. *Frontera Resources Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*, 582 F.3d 393 (2d Cir. 2009). In particular, *Frontera* aligned the Second Circuit with the rule in

other circuits that foreign countries as such were not "persons" entitled to the protection of the Due Process clause. At the same time, the Court took pains to make clear that, because they are separate legal persons, instrumentalities of foreign states remain presumptively entitled to due process protections. *Id*. at 400.

It is therefore incumbent on Skanga to demonstrate that PDVSA has "certain minimum contacts [with New York] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quotation omitted). The burden is Plaintiff's. *In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003) ("On a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction, plaintiff bears the burden of showing that the court has jurisdiction over the defendant.").

Skanga could meet its burden in one of two ways. It could identify legally sufficient facts to establish *general* personal jurisdiction, if "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980); *see also Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 (1984). To do so, Plaintiff would have to show that PDVSA's contacts are of a "continuous and systematic" nature. *Helicopteros,* 466 U.S. at 415-16. Alternatively, Skanga could meet its burden by pointing to legally sufficient facts to establish *specific* personal jurisdiction if the "litigation results from alleged injuries that arise out of or relate to" activities "purposefully directed … at residents of the forum." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472-73 (1985) (internal quotations and citations omitted). Skanga does not have the facts to satisfy either test.

In truth, there is no evidence that PDVSA has significant contacts of any kind with New York. It does not maintain an office in New York. (Ferrín Decl. ¶ 9.1.) It does not have business

operations in the United States. (Martin Aff. Ex. 43, p. 8 (PDVSA Int. Ans.).) It does not, nor did it ever, maintain an account with Corp Banca in New York. (Ferrín Decl. ¶ 10.1.) And, although it does maintain bank accounts at Citibank for the limited purpose of the payment of services, those accounts are not used in connection with the payment or sale of petroleum products (in which PDVSA itself does not participate in any event). (*Id.* ¶ 10.2.) None of this is enough to render to render the exercise of personal jurisdiction consistent with due process, whether viewed through the prism of general or specific jurisdiction.

Having failed to come forward with facts showing that PDVSA has the requisite minimum contacts with New York, Plaintiff's case against PDVSA must also be dismissed for lack of personal jurisdiction.

## Conclusion

For the reasons presented above, PDVSA respectfully submits that undisputed record evidence requires the dismissal of Skanga's case for lack of both subject matter and personal jurisdiction.

Respectfully submitted,

By:  /s/ Lawrence H. Martin

| | |
|---|---|
| Marjorie E. Berman | Ronald E.M. Goodman |
| KRANTZ & BERMAN LLP | Lawrence H. Martin |
| 747 Third Avenue | Vivek Krishnamurthy |
| 32nd Floor | FOLEY HOAG LLP |
| New York, New York 10017 | 1875 K Street NW, Suite 800 |
| Telephone: 212-661-0009 | Washington, DC 20006-1238 |
| Facsimile: 212-355-5009 | Telephone: 202-223-1200 |
| E-Mail: mberman@krantzberman.com | Facsimile: 202-467-9672 |
| | Email: lhm@foleyhoag.com |

*Attorneys for Defendant Petróleos de Venezuela S.A.*

Dated: April 17, 2014