```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
SKANGA ENERGY & MARINE LIMITED,         :
                                        :
                       Plaintiff,       :      11cv4296 (DLC)
                                        :
            -v-                         :      OPINION & ORDER
                                        :
AREVENCA, S.A., PETRÓLEOS DE VENEZUELA  :
S.A., and JAVIER GOZÁLEZ ÁLVAREZ,       :
                                        :
                       Defendants.      :
                                        :
----------------------------------------X
```

APPEARANCES:

For Defendant Petróleos de Venezuela S.A.

Lawrence H. Martin
Ronald E.M. Goodman
Vivek Krishnamurthy
Foley Hoag, LLP
1875 K Street NW, Suite 800
Washington, DC 20006

Marjorie E. Berman
Krantz & Berman, LLP
747 Third Avenue, 32nd Floor
New York, New York 10017

For Plaintiff Skanga Energy & Marine Limited

Femi Salu
Salu & Salu Law Firm, PLLC
2129 Stateline Road West, Suite A
Southaven, MS 38671


DENISE COTE, District Judge:

     Following the close of fact discovery, defendant Petróleos

de Venezuela, S.A. ("PDVSA") has moved to dismiss plaintiff

Skanga Energy & Marine Limited's ("Skanga") second amended complaint ("SAC") pursuant to Rules 12(b)(1) and 12(b)(2), Fed. R. Civ. P., for lack of subject matter jurisdiction and personal jurisdiction, respectively.  PDVSA is owned and operated by the government of Venezuela and asserts a defense of sovereign immunity.  For the following reasons, PDVSA's motion to dismiss for lack of subject matter jurisdiction is granted.  Because Skanga never served any other defendant, this case shall be closed.

**BACKGROUND**

Skanga has the burden to support this action by a preponderance of the evidence.  Skanga's assertion of liability against PDVSA rests on its assertion that Skanga had a contract with Arevenca, S.A. ("Arevenca"), a Venezuelan company that Skanga asserts was PDVSA's agent for the sale of petroleum products to Skanga.  PDVSA has shown that Arevenca was not its agent.  While PDVSA's evidence is largely undisputed, to put that evidence in context it is helpful to describe as well Skanga's assertions regarding the commercial transactions that prompted this lawsuit.  As will be evident, beyond the existence of wire transfers to New York and Swiss bank accounts, very little about these underlying transactions has been established with any certainty.

2

PDVSA is an energy corporation owned and operated by the Venezuelan government.  As a holding company, it does not engage directly in sales and purchases of energy products, but manages subsidiaries that perform that function.  Arevenca is not one of its subsidiaries.

Skanga is a Nigerian "downstream petroleum marketing and trading company" company incorporated in 1992.  Around the time of the alleged transactions leading to this litigation, Skanga had four shareholders.  Skanga's primary shareholder was Chief Lucky N. Igbinedion ("Igbinedion").[1]  Igbinedion was the Governor of Nigeria's Edo State at that time.  Christian Imoukhuede ("Imoukhuede") was Skanga's Chief Executive, and another shareholder.  Imoukhuede became Chief Executive in "June or July" of 2006.  Prior to Imoukhuede's arrival as Chief Executive, Skanga's "business hadn't started," and the company was "inactive."  Skanga made annual filings with the Corporate Affairs Commission of Nigeria for the years 2006, 2007, and 2008, i.e., the years in which the alleged transactions occurred and the year in which Skanga instigated this lawsuit in New York Supreme Court.  Each of those filings contains a statement from Skanga's "Chartered Accountants" "Dynamic Premier & Co." that

---

[1] PDVSA submits evidence that Igbinedion has recently been convicted of corruption related offenses in Nigeria, and has had a number of properties seized, including Skanga's former offices.  Skanga does not respond to these allegations, but they do not ultimately bear on the outcome of this motion.

Skanga "has not done any business, and as a result no profit or
loss account has been annexed thereto."  Imoukhuede admits that
Skanga had not engaged in any commercial transactions with any
entity before the alleged transactions that led to this
litigation.

Virtually the only evidence Skanga has offered in this
action which supports its claim of an agency relationship
between PDVSA and Arevenca is the deposition testimony given by
Imoukhuede in February and April of 2014 as Skanga's Rule
30(b)(6) witness.  See Fed. R. Civ. P. 30(b)(6).  Imoukhuede
testified that the events underlying this litigation began in
September of 2006, when then-Governor Igbinedion hosted a state
function in Abuja, Nigeria attended by the then-Venezuelan
ambassador to Nigeria, Boris Henriquez, and Venezuelan diplomat
and trade consul Enrique Arrundell James ("Arrundell").
Arrundell subsequently became the Venezuelan ambassador to
Nigeria.  Imoukhuede states that at the function he discussed
with Arrundell the possibility of Skanga purchasing petroleum
products from PDVSA, and that Arrundell told him that he could
connect Skanga to PDVSA in order for Skanga to do business with
PDVSA.

Imoukhuede asserts that he traveled to Venezuela twice in
connection with his efforts to achieve an agreement to import
Venezuelan oil.  On his first visit, in 2006, he met at a hotel

4

on October 29 with Arrundell and defendant Francisco Javier González Álvarez ("González"), a representative of Arevenca. Imoukhuede stated that before González arrived at the hotel, Arrundell told Imoukhuede that in order to do business with PDVSA, Skanga would have to work with Arevenca as an "agent." Imoukhuede testified that Arrundell told him that González "represents the corporate agent of PDVSA, and that [Skanga] needed to do this transaction, [Skanga] had to do it with the man who represents the corporate entity."  He stated that when González arrived, González told him that he had "a strong relationship with PDVSA."  No agreement for the sale of petroleum products was reached at that meeting.

Achieved web pages from 2006 and 2007 from Arevenca's website describe the company as a developer of a "logistics center" at a port complex.  The website does not describe Arevenca as an oil company, or disclose any relationship with PDVSA.

On October 30, 2006, Imoukhuede attended a meeting at the Venezuelan Ministry of Energy and Mines with Arrundell, a Ministry employee named Virginia Montilla, and an analyst in the planning department of PDVSA named Beatriz Dam ("Dam").  Neither González nor any other representative of Arevenca was at the meeting.  Imoukhuede explained to the participants at the meeting that his "mission" for the trip was "to solicit

5

petroleum products from PDVSA." Dam responded that her position did not involve sales, and that she was "not in charge of" facilitating any PDVSA commercial transactions. Dam told Imoukhuede that he would have to "do an application through the supply and commerce director . . . of PDVSA" if he wanted to conduct business with PDVSA. The meeting lasted between ten and twenty minutes. It is the only substantive interaction with a PDVSA official that Skanga claims occurred. Imoukhuede does not suggest that there was any discussion of Arevenca at the meeting.

Pursuant to Dam's suggestion, Imoukhuede sent a letter of October 31 to PDVSA official Asdrubal Chavez, expressing Skanga's desire to "purchase petroleum products from Venezuela to Lagos, Nigeria." The letter does not refer to Arevenca. PDVSA did not respond.

After the meeting at the Ministry of Energy and Mines, Imoukhuede describes a meeting with Arrundell and González in his hotel room. According to Skanga's answer to PDVSA's first set of interrogatories, submitted by PDVSA in support of this motion, Arrundell "reiterated his previous statement that in order for Skanga to do business with PDVSA, Skanga was required to work with a PDVSA agent corporation" and that "Arevenca was an agent of PDVSA." It was at this meeting that an oral agreement for the sale of petroleum products was allegedly

reached between Arevenca and Skanga.  Imoukhuede states that he, Arrundell and González "agreed on the price number, the value for freight, [and] the payment pattern."  Skanga describes the purported agreement as follows:

> Corporate Defendants would sell petroleum products to Skanga on credit, in consideration of Skanga's agreement to prepay certain charges in advance of delivery and to pay in full for the product itself within three months of receipt of delivery, with all payments to be made in U.S. dollars to the Corporate Defendants' U.S. bank accounts in New York.

The purported agreement was not documented.

Soon after Imoukhuede returned to Nigeria in November of 2006, Arevenca allegedly made an offer to Skanga to sell Skanga 35,000 metric tons of PDVSA diesel fuel for $16.9 million on credit, with a $1.4 million freight payment that would be due immediately.  As evidence of this transaction, Skanga has offered several documents.  Two of the documents critical to this transaction bear a PDVSA logo.  They are a bill of lading ("Bill of Lading") and a certificate of quality ("Certificate of Quality").  These are the only documents offered by Skanga to link PDVSA to the transaction, and Skanga now admits that both documents are forgeries.  A description of the documents that Skanga has offered in connection with this sale and Skanga's freight payment of $1.4 million follows.

Skanga has produced a purported invoice from Arevenca dated November 7, 2006.  It lists Skanga as the buyer, and states a

price of $16,943,500 for the "Diesel" product, and $1,400,000 for the freight charge.  Imoukhuede testified that Skanga made a $1.4 million freight payment to Arevenca at some point soon after receiving the invoice.

Skanga also produced copies of the Bill of Lading and Certificate of Quality, both of which bear the PDVSA logo, and which were purportedly sent to Skanga to induce Skanga to make payments to Arevenca.  The Bill of Lading names Arevenca as the shipper and Lagos, Nigeria as the destination.  It is dated November 24, 2006.  It specifies that the cargo is 34,997.9 tons of "Diesel" with a value of $16,943,500.  It lists the carrier as "Korean Tankers Maru", and the ship as the "P. Ventur."  The "Certificate of Quality" also bears the logo of PDVSA.  Like the Bill of Lading, it is dated November 24, 2006.  It provides a quality analysis of the purported product.

The Bill of Lading is a fabricated document and Skanga no longer suggests that it is authentic.  Skanga was unable to produce the original Bill of Lading during discovery, and instead produced it in digital form.[2]  According to a letter from

---

[2] Imoukhuede testified that the Bill of Lading had been left in a safe in Skanga's former offices when the company ceased business, and that the current manager of the property, whom Imoukhuede testified was Igbinedion's daughter, was unable to locate it.  PDVSA submitted uncontroverted evidence, however, that the property where Skanga was formerly located was seized by the Nigerian government in 2011, and that that address is currently occupied by a hotel.

Lloyd's Register Group Services Limited to PDVSA's counsel, no record of any ship named P. Ventur has been found.  The Bill of Lading contains a provision that states: "NOTE Liability Limitation for loss or damage in this shipment may be applicable.  See 49 U.S.C. – 14706(c)(1)(A) and (B)."  There is no other indication that the alleged contract between Skanga and Arevenca contemplated that United States law would apply.  The cited provisions of the United States Code in the Bill of Lading refer to limits on liability for "motor carriers."  Similar form bills of lading which also cite to that provision of the United States Code can be found on the Internet.

The Certificate of Quality is likewise a fabricated document.  Skanga does not argue otherwise.  The Certificate of Quality attests to quality testing done at a facility in Amuay, Venezuela, but the telephone code on the Certificate in connection with that site corresponds to an entirely different area in Venezuela.  And an almost identical copy of the Certificate, down to the same "Shore TK" (Shore Tank) number of "AM1628," is available for download on the Internet.  PDVSA has submitted an affidavit of PDVSA's Contract Administration Manager in 2006 and 2007, which states that the alleged Bill of Lading and Certificate of Quality "bear[] no similarity to the format generally used" by PDVSA.

9

As evidence of the purported transfer of $1.4 million in freight charges in November of 2006, Skanga has produced receipts of wire transfers of funds to "Corp Banca NY."  The "Beneficiary Customer" in the two transactions is listed as "Arevenca USA" and "Arevenca," respectively.  The wire receipts, however, do not reflect a payment of $1.4 million, but instead reflect two transactions of November 10, 2006, of $580,000 and $470,000, respectively, for a total of $1.05 million.  The owner of the numbered account listed on the wire transfers has not been identified.  There is no evidence linking the account or the transferred funds to PDVSA.

Imoukhede testified that his second trip to Venezuela occurred between January 5 and 9 of 2007, during which he met with various Venezuelan government officials, but no one from PDVSA.  Skanga claims that during this visit, González made a second offer for sale of petroleum products on behalf of Arevenca, this time doubling the proposed quantity to 70,000 tons.

Skanga has produced an invoice from Arevenca as evidence of this offer, as well as a "bill of loading" [sic, emphasis supplied] with the logo of "Korean Tankers Maru," and a quality certificate bearing Arevenca's logo.  The "bill of loading"

10

lists as the "Vessel" the "Digniti."[3]   The Arevenca invoice is dated December 3 of 2006, prior to Imoukhuede's second visit in January of 2007.   None of the documents in connection with this second transaction mention PDVSA.   According to a letter from Lloyd's Register Group Services Limited to PDVSA's counsel, there is no record of a ship by the name of "Digniti" or "Dignity" active in December of 2006.

In alleged reliance on these documents and representations, Skanga claims that it wired $9.8 million to Arevenca in two payments on December of 2006, and February of 2007, of $2.8 million and $7 million, respectively.   Imoukhuede testified that because he did not have the funds to pay the $2.8 million in freight charges, he obtained a "loan" from a Nigerian company named "M.R.S. Oil & Gas Ltd." ("M.R.S.") to make the December 2006 freight payment.   The 2006 and 2007 annual corporate filings for M.R.S. reported that the company had not commenced business and had current assets of less than $12,000.   Combined with the earlier freight payment of $1.4 million, Skanga alleges that it paid a total sum of $11.2 million to Arevenca.

As evidence of the transfer of these funds, Skanga has produced wire transfer receipts.   With respect to the alleged freight payment of $2.8 million, the receipts show <u>two</u> separate

---

[3] The Certificate of Quality referred to the relevant vessel as a ship named the "Dignity."

transfers from M.R.S. to Arevenca of $2.8 million each, dated December 19 and 28 of 2006, respectively.  With respect to the alleged February 2007 payment of $7 million, the wire transfer receipt shows a February 6, 2007 payment of $7 million dollars from "Skanga Energy and Marine Limited" to a Swiss bank named "BSI SA," located in Lugano, Switzerland.  The name of the "Beneficiary Customer" listed on the wire transfer receipt for the $7 million transfer is "Elegua."[4]  There is no mention of PDVSA on any of these wire transfer receipts.

The two purported shipments did not arrive in Nigeria.  In a June 7, 2007 "letter of protest" to the Ambassador of Venezuela, Imoukhuede states that "a Venezuelan company by the name Arevenca represented by its president, Francisco Javier González Álvarez" provided Skanga with a "Fake PDVSA Bill of Lading," and a "Fake PDVSA Certificate of Quality."  Imoukhuede refers in that letter to those documents as "forged."  And on June 14, 2007, the Nigerian Ambassador to Venezuela sent letters to four Venezuelan officials accusing Arevenca and González of "criminally defrauding" Skanga.  None of those letters mention PDVSA, or suggest that Arevenca was acting as an agent of PDVSA.

A PDVSA official states in his affidavit that "PDVSA neither had nor currently has any business relationship or

---

[4] PDVSA has submitted excerpts from learned treatises which state that "Elegua" is a divinity in the Santería religion known as the "trickster."

relationship of any other kind with any legal entity called Arevenca S.A., Arevenca, or Arenera Venezolana C.A." The official also asserts that PDVSA "does not directly carry out commercial activities related to the purchase and sale or petroleum or refined hydrocarbons," and that such sales and purchases are "performed by other subsidiaries authorized to do so, with the primary marketer being PDVSA Petróleo, S.A." The official further states that "at no time since [he] began working at PDVSA has it or its subsidiaries marketed products through independent commercial agents." And he states that "Venezuelan diplomats [are not] empowered in any way to speak on behalf of PDVSA or its affiliates."

PDVSA has submitted screenshots of PDVSA's website from 2006 and 2007. Those screenshots contain a statement from PDVSA that "Product sales take effect between the provider and the client directly, with no intermediaries (third parties, representatives, etc.)." Skanga does not contest the authenticity of these screenshots.

Skanga filed its original complaint in New York state court against PDVSA, Arevenca, and González on July 21, 2008. PDVSA was served on May 27, 2011. Skanga has never served Arevenca or González. PDVSA removed the case to this Court pursuant to 28 U.S.C. § 1441(d), which permits removal of actions brought against foreign states as defined in the Foreign Sovereign

13

Immunities Act ("FSIA"), 28 U.S.C. § 1603(a).  Skanga filed an amended complaint on December 2, 2011.

PDVSA brought a motion in 2012 to dismiss the amended complaint for lack of subject matter jurisdiction because of PDVSA's purported immunity under the FSIA, and on the ground of forum non conveniens.  The motion was denied in an Opinion of June 21, 2012.  Skanga Energy & Marine Ltd. v. Arevenca S.A., 875 F. Supp. 2d 264, 266 (S.D.N.Y. 2012), aff'd sub nom., Skanga Energy & Marine Ltd. v. Petroleos de Venezuela S.A., 522 F. App'x 88 (2d Cir. 2013).  An Order of May 23, 2013, stated, inter alia, that PDVSA "may bring a renewed motion to dismiss for lack of subject matter jurisdiction at any time that it can represent that discovery on that issue has been completed."

Skanga filed a second amended complaint ("SAC") on May 30, 2013.  Following the conclusion of fact discovery, PDVSA brought the instant motion to dismiss on April 17, 2014.  The motion was fully submitted on May 22.


## DISCUSSION

As framed by PDVSA, this motion to dismiss for lack of subject matter jurisdiction turns on the question of whether Arevenca acted as PDVSA's agent with respect to the alleged transactions at issue.  PDVSA argues that if Arevenca was not PDVSA's agent then this action is barred by the FSIA, 28 U.S.C.

14

§ 1602, et seq.   PDVSA doubts the veracity of many of the facts pled by Skanga related to the alleged transactions, but contends that its motion should be granted even if there was a contract for the sale of petroleum products between Arevenca and Skanga and Skanga suffered a loss of money when the products were not delivered as promised.

The standard of review here differs from the standard applied in this Court's Opinion of June 21, 2012, which addressed only the legal sufficiency of Skanga's assertion of jurisdiction.  Skanga, 875 F. Supp. 2d at 264.  As the Court of Appeals has explained,

> [i]n a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), the defendant may challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both.  How the district court proceeds to resolve the motion to dismiss depends upon whether the motion presents a factual challenge.  If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff.  But where evidence relevant to the jurisdictional question is before the court, the district court may refer to that evidence.

Robinson v. Gov't of Malaysia, 269 F.3d 133, 140 (2d Cir. 2001) (citation omitted).

Disputed factual issues pertaining to jurisdiction under the FSIA are resolved according to a burden shifting standard:

> Once the defendant presents prima facie evidence that it is a foreign sovereign, the burden falls on the plaintiff to establish by a preponderance of the

> evidence that an exception under the FSIA permits
> jurisdiction over the foreign sovereign.  Where the
> plaintiff satisfies her burden that an FSIA exception
> applies, the foreign sovereign then bears the ultimate
> burden of persuasion that the FSIA exception does not
> apply.

Swarna v. Al-Awadi, 622 F.3d 123, 143 (2d Cir. 2010) (citation

omitted) (emphasis supplied).


The FSIA and the Commercial Activity Exception

"Congress established in the FSIA a comprehensive framework

for resolving any claim of sovereign immunity.  The Act

comprehensively regulates the amenability of foreign nations to

suit in the United States."  Republic of Argentina v. NML

Capital, Ltd., 134 S. Ct. 2250, 2256 (2014) (citation omitted).

The FSIA "provides the sole basis for obtaining jurisdiction

over a foreign state in the courts of this country."  Rogers v.

Petroleo Brasileiro, S.A., 673 F.3d 131, 136 (2d Cir. 2012)

(citation omitted).  "Agenc[ies] and instrumentalit[ies]" of

foreign states are included in the FSIA's definition of "foreign

state[s]."  28 U.S.C. § 1603.  It is undisputed that PDVSA is a

foreign sovereign for FSIA purposes.

Under the FSIA, a foreign state "shall be immune from the

jurisdiction of the courts of the United States and of the

States," subject to certain exceptions.  28 U.S.C. § 1604.  Only

the "commercial activity exception," 28 U.S.C. § 1605(a)(2), is at issue here.

The "commercial activity exception" to foreign state immunity provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). "As is plain from the language of the section, each of its three clauses describes different categories of conduct for which the foreign state is denied immunity." Guirlando v. T.C. Ziraat Bankasi A.S., 602 F.3d 69, 74 (2d Cir. 2010). Skanga relies solely upon the third clause. For a foreign sovereign defendant to be subject to jurisdiction under the third clause of the commercial activity exception,

> the lawsuit for which jurisdiction is sought must be (1) based upon an act outside the territory of the United States; (2) that was taken in connection with a commercial activity of the foreign state outside this country; and (3) that caused a direct effect in the United States.

Virtual Countries, Inc. v. Republic of South Africa, 300 F.3d 230, 236 (2d Cir. 2002) (citing Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611 (1992)).

Skanga asserts that a principal-agent relationship exists between PDVSA and Arevenca, which permits the acts of Arevenca to be imputed to PDVSA.  It asserts that through negotiations conducted in Venezuela Arevenca sold petroleum products to Skanga and received payment for that commodity, but failed to deliver it to Skanga in Nigeria.  It identifies the effect in the United States as Skanga's wire transfers of funds to a New York bank account.  PDVSA contends that Skanga has not carried its burden of demonstrating an agency relationship.

In a case grounded in diversity jurisdiction, a federal court "must apply the choice of law analysis of the forum state."  GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc., 449 F.3d 377, 382 (2d Cir. 2006).  Under New York choice of law rules, agency law questions are governed by the law of the forum with "the most significant relationship with the particular issue in conflict."  Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank, 98 N.Y.2d 238, 244-45 (N.Y. 2002); see also Restatement (Second) Conflict of Laws § 292 (1971) (choice of law questions of actual and apparent authority subject to "most significant relationship" test).  "To determine the jurisdiction with the greatest interest in the dispute, New York courts consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile of the

18

contracting parties." Bank of New York v. Yugoimport, 745 F.3d 599, 609 (2d Cir. 2014) (citation omitted).

"[T]he FSIA creates federal question jurisdiction but does not supply any substantive law of liability." Id. at 609 n.8. PDVSA contends, and Skanga assumes, that Venezuelan law applies to the agency question. The parties are correct that Venezuelan law governs the question of whether Arevenca was PDVSA's agent. Venezuela has "the most significant relationship" with the issues at stake here. Id. at 609. Both PDVSA and Arevenca are Venezuelan entities. Since PDVSA is a government instrumentality, Venezuela has a significant interest in defining who can act as its agent. In addition, the alleged negotiations and contracting took place in Venezuela, and the petroleum products purportedly at issue are from Venezuela. Accordingly, Venezuelan law applies.

Courts "may find and apply foreign law." Aon Fin. Products, Inc. v. Societe Generale, 476 F.3d 90, 101 (2d Cir. 2007) (citation omitted); see also Terra Firma Investments (GP) 2 Ltd. v. Citigroup Inc., 716 F.3d 296, 301 (2d Cir. 2013) (Lohier, J., concurring) ("[D]etermining foreign law falls well within the province of federal courts." (citation omitted)). The Federal Rules of Civil Procedure provide that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not

submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.  The Second Circuit has "urged district courts to invoke the flexible provisions of Rule 44.1 to determine issues relating to the law of foreign nations because such issues can be expected to come to the federal courts with increasing frequency as the global economy expands and cross-border transactions increase."  Eli Lilly Do Brasil, Ltda. v. Fed. Express Corp., 502 F.3d 78, 91 (2d Cir. 2007) (citation omitted).

PDVSA has submitted expert testimony on Venezuelan agency law in the form of a declaration by Luis Alberto García Montoya ("García"), a practicing attorney in the courts of Venezuela and a professor of commercial law at the Universidad Católica Andrés Bello in Caracas.  Skanga has submitted expert testimony on Venezuelan law in the form of a declaration of Manuel A. Gómez ("Gómez"), an attorney licensed to practice law in Venezuela, and an Associate Professor of Law at Florida International University College of Law in Miami.

Based on the García and Gómez submissions, and the authorities on which they rely, this Court finds that the Venezuelan law of agency is as follows.  Agency arrangements under Venezuelan law are governed by three provisions of the Civil Code of Venezuela ("CCV").  They state:

> Article 1684.  An agency agreement is a contract
> whereby one party agrees to act on behalf of another
> party that grants the authority to do so, whether for
> consideration or not.
>
> Article 1685.  An agency agreement may be express or
> implied.  Acceptance may be implied in the performance
> of the agency agreement by the agent.
>
> Article 1691.  When the agent acts in his own name,
> the principal shall have no legal action against those
> with whom the agent has entered into a contract, or
> vice versa.  In this case, the agent has a direct
> obligation to the party that entered into the contract
> with the agent, as if the transaction were his own.

CCV, as published in Official Gazette, Special Edition No. 2990, issued on July 26, 1982, §§ 1684, 1685, 1691.[5]  The principal-agent relationship must be established through an actual agency agreement; Venezuela has no analogue to the common law concept of apparent authority.  Finally, pursuant to Venezuela's Foreign Service Act, no foreign service official has the power to enter into any contract binding on the Republic, its agencies or the companies in which it has a majority equity interest, including PDVSA.

---

[5] García points to certain other forms of agreement under Venezuelan law for one party to act on behalf of another, none of which are relevant to the facts here.  García refers to the concepts of "commission agent[s]" who conduct business on behalf of their principal but in their own name and are personally bound by the contract, "commercial factors and clerks," who manage a "mercantile or industrial organization" and are registered with the Venezuelan government, and "negotiorum gestor[s]" who take over a person's affairs when that person is unable to attend to them.

Skanga has failed to establish by a preponderance of the evidence that an agency relationship existed between PDVSA and Arevenca such that the commercial activities exception to PDVSA's immunity under the FSIA applies.  See Al-Awadi, 622 F.3d at 143.  As a result, this Court is without subject matter jurisdiction over the claims against PDVSA.

Skanga has produced no persuasive evidence of the existence of an agency agreement between PDVSA and Arevenca, whether express or implied.  The only commercial documents that bear the PDVSA's logo -- the Bill of Lading and Certificate of Quality -- are conceded forgeries.  And Skanga has submitted no evidence that PDVSA participated in forging those documents.  There is also no evidence that any of the money transferred by Skanga to the bank accounts in New York and Switzerland ended up with PDVSA.

Nor is there any evidence that Arrundell was empowered to act on behalf of PDVSA and enter into an agency agreement on behalf of PDVSA with Arevenca.  Arrundell was not employed by PDVSA and Venezuelan diplomats are without authority to bind PDVSA under either Venezuelan law or PDVSA's policies.  Skanga's only evidence of an agency relationship between Arevenca and PDVSA is Imoukhuede's testimony that Arrundell told him that Arevenca/González "represents the corporate agent of PDVSA." Accepting for purposes of this analysis only that Arrundell's

statement is admissible as an admission against PDVSA on the theory that both are associated with the Venezuelan state, this statement is not sufficient to carry Skanga's burden.  Indeed, Skanga's expert Gómez concludes only that Arrundell may be personally liable under Venezuelan law for acting outside the scope of his official duties; Gómez does not contend that this statement by a Venezuelan diplomat could create an agency relationship.  At best, Arrundell's statement to Imoukhuede is a statement of his personal belief.  It is not enough to create an actual agency relationship between two entities, neither of which employ him.

PDVSA has submitted compelling evidence that Arevenca is not an agent of PDVSA.  As Skanga concedes, in the only interaction Skanga had with a PDVSA employee, Dam instructed Skanga that any proposal for a sale had to be made to PDVSA directly.  Moreover, PDVSA's Contract Administration Manager during the time of the relevant transactions explains that PDVSA does not operate through independent third party agents.  That PDVSA official also specifically disclaimed any relationship between PDVSA and Arevenca.  Moreover, the fact that PDVSA is a holding company that does not directly engage in sales, but instead supervises its subsidiaries, undercuts Skanga's contention that PDVSA itself was the principal in the alleged sales transaction in question.

Skanga's remaining arguments in opposition to PDVSA's motion are unavailing.  Skanga's principal remaining argument is that PDVSA is barred by collateral estoppel and res judicata (also referred to as issue and claim preclusion) from re-litigating the issue of subject matter jurisdiction in light of this Court's June 21, 2012 decision.  Collateral estoppel and res judicata apply only to a final decision rendered on a particular legal issue.  See Wilson v. Steinhoff, 718 F.2d 550, 552 (2d Cir. 1983); see generally Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 326 (1979).  As explained above, under the FSIA a party may bring a motion attacking either the legal sufficiency or the factual adequacy of an assertion of jurisdiction through an FSIA exception in a complaint.  See Robinson, 269 F.3d at 140.  The June 21 Opinion addressed only the legal sufficiency of Skanga's complaint, taking all allegations as true.  See Skanga, 875 F. Supp. 2d at 270.  Now that fact discovery has occurred, PDVSA's motion attacks the factual basis for Skanga's allegation of an agency relationship between Arevenca and PDVSA.  The doctrines of collateral estoppel and res judicata do not bar PDVSA's motion.[6]

---

[6] Because the Court is without subject matter jurisdiction to adjudicate this dispute, it is not necessary to reach PDVSA's allegation that the Court lacks personal jurisdiction over it.

**CONCLUSION**

PDVSA's April 17, 2014 motion to dismiss Skanga's claims against PDVSA is granted.  The claims against defendants Arevenca and González are dismissed for failure to prosecute. The Clerk of Court shall close the case.


SO ORDERED:

Dated:    New York, New York
          August 12, 2014


_____
              DENISE COTE
     United States District Judge